## APPEALS OF H. F. KERR AND A. E. CLEGG.

Docket Nos. 1973, 1975.    Promulgated January 15, 1927.

1. The Board has no jurisdiction to inquire into the motives of the Commissioner in making an assessment or into the conduct of his subordinates in levying or enforcing it, nor does the fact that the United States is not suable in tort confer such jurisdiction.

2. A deficiency otherwise found to be valid will not be disapproved on the ground that the Commissioner has failed to grant a hearing authorized by law prior to making an assessment based on the alleged deficiency.

3. Upon a sale of stock, where the seller tenders and delivers to the buyer the certificates of stock and the buyer tenders to the seller the correct amount of money in payment and places the money in the hands of the seller, who takes it and places it on a table before his attorney for counting and the attorney counts it, finds it correct in amount, and places it in a bag and another of the seller's agents starts to carry it away, the transaction of sale is completed and the income, if any, is received.

4. Under such circumstances the sale is not rendered incomplete or the receipt of income prevented by the fact that representatives of the Commissioner, whose presence in the banking room where the transaction occurred was unknown to the seller but known to the buyer, served notice of an assessment and demand for taxes, and notice of statutory lien on the seller personally before the money was all counted, and on the seller's agent after the count was completed and the money placed in the bag.

5. Under the above facts the sale is not rendered incomplete or the receipt of income prevented by the fact that the Government agents refused to allow the seller (petitioner) to have unrestricted custody and control of the funds and insisted that the funds be placed in a trust company under certain restrictions, the income from the funds on deposit being paid to the seller.

6. So far as concerns the receipt of income, where legal possession by petitioner of the proceeds of a sale is once established as a fact, the length of the unrestricted possession is immaterial and the transaction is not affected by subsequent events.

7. Before the provisions of section 250(e) of the Revenue Act of 1921 authorizing a penalty of 5 per centum and interest of 1 per centum per month may be invoked, the provisions of the law must be strictly complied with and a legal demand must be made.

*Charles Evans Hughes, Esq.*, and *W. O. Morgan, Esq.*, for the petitioners.

*A. Calder Mackay, Esq.*, and *M. B. Leming, Esq.*, for the Commissioner.

Petitioners allege error on the part of the Commissioner:

(1) In determining that a profit was realized upon the sale in 1920 of petitioners' stock in the American Ship and Commerce Navigation Corporation.

(2) In determining that petitioners realized or received in 1920 the proceeds of said sale.

(3) In rejecting petitioners' claims for abatement.

The facts and circumstances are identical in the two cases and the alleged income upon which the deficiencies were based arose out of the same transaction. The appeals were consolidated for hearing and this decision will cover both appeals.

### FINDINGS OF FACT.

H. F. Kerr and A. E. Clegg, petitioners herein, during the taxable year 1920 and prior thereto, were subjects of Great Britain. Both of the petitioners applied for United States citizenship prior to the year 1920, but neither of them became a naturalized citizen of the United States until after the year 1920. During the taxable year and for some years prior thereto petitioners resided in New York City, being engaged in the business of operating steamships.

In 1919 the Kerr Navigation Corporation, a New York corporation, hereinafter called the Old Navigation Corporation, owned eight ocean-going vessels. The Kerr Steamship Co., Inc., a Delaware corporation, was the operating agent and broker for the Old Navigation Corporation. The petitioners in 1919 and prior years were stockholders in the Kerr Steamship Co., Inc., and the Old Navigation Corporation, their stock having been acquired subse-

quent to March 1, 1913. In September, 1919, there occurred a reorganization of the Old Navigation Corporation by the terms of which the eight vessels, together with other assets of that corporation, were transferred to the American Ship and Commerce Navigation Corporation, a New York corporation, hereinafter called the New Navigation Corporation, in consideration of 40,000 shares of Class A and 35,000 shares of Class B stock of the latter corporation. Under the reorganization plan the American Ship and Commerce Corporation, a Delaware corporation, hereinafter called the Holding Corporation, acquired by purchase a majority of the outstanding capital stock of the New Navigation Corporation.

Under the reorganization above referred to, and by virtue of their previous holdings in the Old Navigation Corporation, petitioners acquired substantial stock interests in the New Navigation Corporation, which stock they owned on August 28, 1920, the date of the transaction here in issue.

On September 3, 1919, the New Navigation Corporation, the Holding Corporation, and the Kerr Steamship Co., Inc., entered into an agreement, known as the Operating Agreement, whereby the New Navigation Corporation appointed the Kerr Steamship Co., Inc., its exclusive agent to manage and operate the vessels acquired from the Old Navigation Corporation and all other vessels that it might acquire during the existence of the agreement. The Holding Corporation had the right to terminate said agreement at any time upon ninety days' notice and upon compliance with a certain other agreement referred to therein as being executed simultaneously therewith. Said Operating Agreement provided, among other things:

WHEREAS simultaneously with the execution hereof and pursuant to the said Plan of Re-organization a contract is to be entered into in substantially the form of the contract hereto annexed between the Holding Company and the Kerr Navigation Corporation and Mr. H. F. Kerr and the New Navigation Company establishing the option therein provided for the sale to the Holding Company of stock of the New Navigation Company * * *

* 　 * 　 * 　 * 　 * 　 * 　 *

SIXTH:—This contract shall continue in effect for the period of five years from and after the date hereof unless sooner terminated by the joint action of the New Navigation Company and of the Holding Company which corporation shall have the right to terminate this agreement at any time upon ninety days notice to the Steamship Company in writing signed by the New Navigation Company and by the Holding Company and upon the performance by the Holding Company of its obligation expressed in the said agreement a copy of which is hereto annexed providing for an option for the sale to the Holding Company of stock of the New Navigation Company and the termination hereof shall not become effective except upon such performance by the Holding Company of such obligation for the purchase of such stock.

On the same day, September 3, 1919, a second agreement, known as the Option Agreement, was entered into between the Holding

Corporation, the Old Navigation Corporation, H. F. Kerr, and the New Navigation Corporation, which provided, *inter alia:*

The Holding Company does hereby agree with Mr. Kerr and does hereby agree with the Kerr Navigation Corporation for the benefit of such stockholders of the Kerr Navigation Corporation who shall upon the reorganization provided for in the said plan receive any of the 40,000 shares of Class A stock or any of the 35,000 shares of the Class B stock of the New Navigation Company that if within the period of five years from and after the date hereof notice to terminate the New Operating Agreement shall be given by the joint action of the New Navigation Company and the Holding Company then at any time within the period of ninety days after the giving of such notice any stockholder of the Kerr Navigation Corporation who shall upon the reorganization provided for in the said plan for reorganization have received any of the Class A stock or any of the Class B stock of the New Navigation Company shall have the option to sell to the Holding Company at the price hereinafter specified such Class A stock and such Class B stock of the New Navigation Company and the Holding Company hereby agrees in such event to buy such stock at such price. The price for the Class A stock upon such sale shall be One Hundred dollars ($100.) per share plus Seven Dollars ($7.00) per share per annum for the period from the date of issue thereof up to the time of such sale less the amount of dividends paid upon such stock since the date of issue. The price for the Class B stock upon such sale shall be One Hundred dollars ($100.) per share.

The Old Navigation Corporation was dissolved in October, 1919, and upon dissolution petitioner Clegg received 11,547 shares Class A and 12,629 shares Class B stock, and petitioner Kerr received 11,547 shares Class A and 12,630 shares Class B stock in the New Navigation Corporation.

The Holding Corporation and the New Navigation Corporation on July 24, 1920, terminated the said New Operating Agreement, pursuant to the terms of said agreement, and shortly thereafter the petitioners herein duly notified the Holding Corporation of their election to exercise the option given them, as stockholders of the Old Navigation Corporation, under the said Option Agreement to sell their stock in the New Navigation Corporation to the Holding Corporation at the agreed price. On the morning of Saturday, August 28, 1920, pursuant to said notice, the petitioners, accompanied by their attorneys, Herbert Noble and Scott Scammell, a Mr. Heath, an employee of said attorneys, Thomas Clegg, a brother of petitioner Clegg, and an ex-police inspector in the employ of the petitioners, went to the office of the Holding Corporation for the purpose of delivering their stock in the New Navigation Corporation and receiving payment therefor in accordance with said Option Agreement. Upon their arrival a Mr. Lishawa, treasurer of the Holding Corporation, called in a Mr. Harriman, an officer of the corporation, and George A. Ellis, attorney for the corporation. Petitioners' attorney Noble stated that they had come to tender to the Holding Corporation petitioners' stock in the New Navigation Corporation and handed the stock certificates

to Ellis for examination. Ellis, after examining the certificates, returned them to Noble and asked in what form petitioners desired payment, whereupon petitioners demanded payment in legal tender. Petitioners demanded legal tender in order to make it difficult for the Holding Corporation to comply with the terms of the Option Agreement, compliance with which was a condition of terminating the Operating Agreement, which Kerr and Clegg did not want to be terminated. Neither the Holding Corporation nor the Government officials knew prior to the morning of August 28, 1920, that legal tender was to be demanded. After some delay the parties agreed to conclude the transaction at the Chase National Bank, with which the Holding Corporation had arranged for the required amount of legal tender. Both parties then proceeded to the Chase National Bank,— the petitioners, their attorneys, Noble and Scammell, Thomas Clegg, Heath and the ex-police inspector, in the party representing the petitioners, and Harriman, Ellis, Lishawa, and Frederick H. Stokes, an associate of Ellis, in the party representing the Holding Corporation. At the bank Walter Camp, Jr., and a Mr. Robinson, officers of the Holding Corporation, joined its party. At the bank the parties gathered at a table or desk in the main banking room, and there waited for the arrival of a bank official with the money, having been advised, when petitioners requested a private room, that a private room was not available, although certain private offices about the room were unoccupied at the time. The total amount of money involved in the transaction was $4,913,819.60.

In May, 1920, Walter B. Wight, an auditor in the Income Tax Unit of the Bureau of Internal Revenue, was sent to New York to investigate the affairs of these petitioners and the various companies in which they were interested. Said auditor was engaged continuously in such investigation throughout the summer of 1920 to August 28, 1920, and for some months subsequent thereto. After several months of investigation and while engaged in the investigation of petitioner Kerr's business affairs, said auditor was advised by Kerr that he was going abroad, but had given petitioner Clegg a power of attorney with full authority to act in his stead. Said auditor upon further inquiry was informed that Clegg was also going abroad, and at that time he thought the information referred to petitioner Clegg, but later it developed it referred to Thomas Clegg, brother of the petitioner. During his investigation Wight learned of the reorganization of the Old Corporation and the exchange of stock and the Option Agreement, above referred to. Upon being informed, within a few days prior to August 28, 1920, of petitioners' intention of going abroad, said auditor sought to learn from the Holding Corporation whether demand for the payment of the money

for the stock had been made by petitioners. Said auditor first came in contact with Harriman, or anyone else representing the Holding Corporation, sometime in the week ending August 28, 1920, during which week he was frequently in touch with Harriman and Ellis. Said auditor, being informed of the election of petitioners to sell their stock under the Option Agreement, requested Harriman to keep him advised of all the details concerning the transaction so that he or some Government representatives might be present when the payment was made. Auditor Wight reported to the Bureau of Internal Revenue at Washington, D. C., the information he had obtained. Harrison B. McCawley, Assistant Solicitor, was instructed to do what he could to prevent Kerr and Clegg from getting out of the country with the money. Prior to the week ending August 28, 1920, no information had been given to said auditor by either Harriman or Ellis, nor did said auditor know either of said gentlemen. On the morning of August 28, 1920, said auditor was informed, by Harriman or Ellis, that petitioners had come to their (the Holding Corporation's) office to tender their (petitioners') stock and had demanded payment therefor in legal tender, and that the payment would be made at the Chase National Bank. Wight then requested that they keep in touch with him, so that he, with others, could be present when the transaction took place.

Auditor Wight, knowing of petitioners' decision to exercise the option to sell their stock, on August 27, 1920, communicated by telephone to the Bureau of Internal Revenue at Washington, D. C., the information and figures upon which the Acting Commissioner of Internal Revenue on August 27, 1920, made a special or summary assessment of income taxes alleged to be due from these petitioners. The computation of the tax so assessed was based upon the information and figures developed in the investigation of the affairs of petitioners. At the time of said assessment Wight had not investigated the affairs of the petitioners as to their income tax liability for 1920, but he did know of the election to exercise the option to sell their stock. In arriving at the amount of tax so assessed against each petitioner the auditor considered both the reorganization of the Old Navigation Corporation in 1919, resulting in the acquisition by petitioners of new stock in exchange for old stock, and the proposed sale of stock to be made by petitioners on August 28, 1920, and determined that upon the basis of either transaction the amount of tax would be substantially the same. The assessment certificates so issued by the Acting Commissioner of Internal Revenue on August 27, 1920, and the Assessment List attached thereto, purported to be an assessment of additional income tax in August, 1920. The Assessment List purported to be the August Special 1920 List of income tax against these petitioners and showed the amount of tax to be

$1,501,288.20 as due from each of the petitioners, or a total of $3,002,576.40 as due from both. Opposite the name of each petitioner on the Assessment List, and under the heading of " Remarks," appeared the words and figures " 1920 Dummy S. A. 8/27/20," which meant that it was a Special Assessment of August 27, 1920, made where no return had been filed by the taxpayer. Said assessment of August 27, 1920, purported to be an assessment of income taxes due from these petitioners for 1920. The Commissioner did not declare the taxable period terminated during the year 1920. The said assessment of August 27, 1920, was taken from Washington to New York by Daniel B. Priest, an Assistant Solicitor of Internal Revenue, and was received in the office of the Collector of Internal Revenue for the Second District of New York on the evening of August 27, 1920. On August 28, 1920, there was issued by said collector, addressed to each of the petitioners, a notice and demand for the tax so assessed, subpœnas to appear before the collector, and notices of a statutory lien for taxes. Said notices of lien were on the regular Government form of " Notice of Tax Lien Under Internal Revenue Laws," and asserted the lien provided for by Rev. Stats., section 3186. A notice of lien was issued as to each of the petitioners for the income tax so assessed and by its terms was a lien asserted against all property of the petitioners not exempt under Rev. Stats., section 3187. Certain of said notices recited the " Period of Liability " as the year 1920 and others as the year 1919. The copy of lien served on petitioner H. F. Kerr was substantially as follows:

NOTICE OF TAX LIEN UNDER INTERNAL REVENUE LAWS.

United States Internal Revenue,
2nd District of New York, N. Y.
August 28, 1920.

Pursuant to the provisions of an Act of Congress, approved March 4, 1913, notice is hereby given that there have been assessed, under the internal-revenue laws, against the following-named person, firm, or company taxes (including penalties), which remain unpaid and which, with all costs and interest are, under the provisions of Section 3186 of the Revised Statutes of the United States, as amended by Section 3, Act of March 1, 1879, a lien upon all property and the rights to property belonging to the said delinquent, except only such property as is specially exempted from such lien under the provisions of Section 3187 of the Revised Statutes of the United States, to wit: (Black bag containing approximately $4,900,000 in Box 3061).

Name of delinquent_____H. F. Kerr
Residence, or place of business_____44 Beaver St. New York, N. Y.
Articles or occupation subject to tax_____Income Tax
Period of liability_____1920
Amount of tax assessed_____$1,501,288.20
Additional (penalty) tax assessed_____
Date of receipt of assessment list by collector_____August 27, 1920
                              (Signed)      Wm. H. Edwards,
                                                Collector.

Wight, McCawley, Priest, and a Mr. Kostant, a deputy collector in the office of the Collector of Internal Revenue for the Second District of New York, on the morning of August 28, 1920, went to the Chase National Bank, taking with them the notices and other papers above mentioned, and were present in the bank when the transaction involving the sale of stock took place, but they were not in the group of men representing the parties to the sale nor was their presence known to petitioners. The Government officials were stationed at various points about the bank and the corridor leading to the exit.

While waiting for the arrival of the bank official with the money, Noble handed the certificates of stock owned by petitioners to Ellis, who again examined them and returned them to Noble, who in turn placed them on the table. Ellis suggested that receipts be prepared to be executed by the petitioners upon payment of the purchase price, but Noble advised him that no receipts would be given and that the Holding Corporation was not entitled to any receipts for the money. Thereupon Ellis said, "Well, Mr. Noble, of course if you are not going to give us any receipts, we will make this payment to Mr. Kerr and to Mr. Clegg personally. We have got witnesses for that at least." Noble protested vigorously against this procedure. In a short time the bank officials appeared with the money and placed it in two piles or stacks on the table. Thereupon Noble said, "Well, we are ready to close," and Ellis replied, "You know, Mr. Noble, what I told you. Mr. Kerr and Mr. Clegg must come up here and tender their stock and get the money if they want it." Noble again protested against such a procedure and asserted that he, as attorney, was authorized to act for petitioners. Noble inquired if they might count the money, to which Ellis agreed that they might.

Ellis picked up from the table the certificates of stock belonging to petitioner Kerr and asked Kerr if he tendered the shares of stock therein recited, and demanded payment therefor, pursuant to the terms of said Option Agreement. Kerr replied that he did. Thereupon Ellis picked up one stack of the money, stating that the Holding Corporation, pursuant to said Option Agreement, thereby paid to him the money (naming the amount) for his stock, and handed it to petitioner Kerr, who immediately placed it on the table in front of Noble. Ellis thereupon put the certificates of stock which had belonged to Kerr in his pocket. Ellis then picked up the certificates of stock belonging to petitioner Clegg and asked Clegg if he tendered the shares of stock therein recited, and demanded payment therefor, pursuant to the terms of said Option Agreement. Clegg, after some delay and evasion, replied that he did, whereupon Ellis picked up the second stack of money, stating that the Holding Corporation, pursuant to said Option Agreement, thereby paid to him the money

(naming the amount) for his stock, and handed it to petitioner Clegg, who immediately placed it on the table in front of Noble. Ellis then put the certificates of stock which had belonged to Clegg in his pocket, and, with the others of his party representing the Holding Corporation, withdrew some distance from the table and prepared to leave the bank. Noble and his associate, Scammell, proceeded to count the money. Petitioners Kerr and Clegg, after placing the money on the table in front of Noble, withdrew from the table and started to leave the bank to return to their offices. As the petitioners were leaving the bank and just as they reached the outer door opening onto the street from the corridor of the bank, they were stopped by the Government officials waiting there and served with notices and demands for taxes, subpoenas to appear before the Collector of Internal Revenue, and notices of a statutory lien.

The notice and demand for taxes asserted that taxes in the amount of $1,501,288.20 has been assessed against each petitioner and demanded immediate payment of such tax. The petitioners then returned to the table in the banking room and handed the papers served on them to their attorneys. Upon inquiry by their attorneys petitioners protested that they did not owe any taxes. Noble inquired of Priest what these notices meant and was advised that they were notices of an assessment of additional taxes for 1919. Noble and Scammell then continued counting the money and on conclusion found it correct in amount. The money was placed in a black bag belonging to Thomas Clegg, specifically brought for this purpose. McCawley approached the table and served a notice of lien for taxes on Noble and also pasted a similar notice on the bag containing the money. At that time the money was in the bag and in reply to an inquiry from McCawley, Noble stated that the money was in his (Noble's) possession. Petitioners' attorneys sought an explanation from McCawley as to what taxes were referred to and were advised that they were for additional income taxes for 1919.

The Government officials refused to permit petitioners or their attorneys to remove the money to their personal safe or vault and insisted that the matter must remain in the same situation as then existed. Petitioner Clegg then arranged with the Equitable Safe Deposit Co. for a box in its vaults in which to place the money. Thomas Clegg took hold of the bag containing the money and started as though to carry it away when a Government official interfered and also took hold of the bag, and there was a scuffle over the possession of it. Accompanied by the petitioners and their representatives, and the other Government officers, and with Thomas Clegg and Kostant jointly carrying the bag, the party proceeded to the Equi-

table Safe Deposit Co. The bag of money was placed in a box in the vaults of that company and notices of tax lien were served on the company and on its secretary, Frank E. Ryon, and similar notices were posted on the box and on the vault containing the bag of money. Said box was taken in the name of Thomas Clegg, brother of petitioner Clegg, with Noble as a deputy. The Government officers advised Ryon not to allow anyone access to said box except by consent of either the Commissioner or the Collector. On August 31, 1920, McCawley filed copies of said notices of lien with the Clerk of the United States District Court in New York City. Thereafter the petitioners, through their attorneys, entered into a series of negotiations and conferences with the Commissioner and Solicitor of Internal Revenue in an effort to obtain the release of this money from the claims of the Government and from the restrictions upon their use of the money resulting from such claims. In the course of such negotiations petitioners on August 31, 1920, wrote to Priest, referring to a conference held that day between Priest, Johnson (Solicitor of Internal Revenue), McCawley and Wight, representing the Government, and Noble and Kermit Roosevelt representing petitioners, in which they said, *inter alia:*

> We really desire to immediately place all of the funds received by us in a "replacement fund" (so-called) so that we may acquire American Flag Ships under the provisions of the Jones Bill and the regulations of the Shipping Board.

The Government officials, however, refused to release the money from the claims of the Government, but in the early part of September, 1920, did consent to the placing of the money on deposit, to be invested and reinvested in securities, the interest and income therefrom to be paid to the petitioners, provided that the principal sum, and the securities in which invested, should remain subject to the lien of the Government for taxes.

By letters dated September 7, 1920, the petitioners deposited all of the money received as proceds of the sale of stock in the Empire Trust Co. upon the terms and with the instructions therein set forth. By letters dated September 7, 1920, the Empire Trust Co. agreed to accept said money for deposit upon the terms therein set forth, and by further letters of the same date acknowledged receipt of said money. By letters also dated September 7, 1920, the Collector of Internal Revenue for the Second District of New York consented to the delivery of the money by the Equitable Safe Deposit Co. to the Empire Trust Co. Said letters of September 7, 1920, were identical in all particulars with respect to each of the petitioners, except as to the name of the petitioner and the amount of money transferred, the amount belonging to petitioner Kerr being $100 more than the

amount belonging to petitioner Clegg. The following are copies of the letters dated September 7, 1920, written by the above named parties with reference to the transfer of the money belonging to petitioner Clegg:

September 7th, 1920.

Collector of Internal Revenue,
Second District of New York,
Custom House Building,
New York City, N. Y.

Dear Sir:

It is our understanding that there is now in the possession of the Equitable Safe Deposit Company of New York the sum of $2,456,859.80 in currency belonging to Mr. A. E. Clegg, 104 Eighth Avenue, Brooklyn, N. Y., and that the said Safe Deposit Company was served with notice of a lien in the amount of $1,501,288.20 for alleged unpaid income tax assessed against Mr. Clegg on August 27, 1920, which notice of lien was served under date of August 28, 1920.

It is our further understanding that Mr. Clegg has requested you to permit the transfer of the above mentioned fund from the Equitable Safe Deposit Company of New York to the Empire Trust Company to invest and reinvest, including the loaning of the same on call loans (no investments, however, to be made in securities and enterprises in which Mr. Clegg is personally interested) and to continue such investments and reinvestments from time to time.

Mr. Clegg has assured us that he intends to become a fully naturalized American citizen in the course of the next few months, and he has further assured us that it is his desire, expectation and intention to arrange to have this money invested in American flag ships under the provisions of the Jones Bill and such regulations as the Shipping Board shall establish, it being his desire that this fund shall constitute a "replacement fund" so-called.

In consideration of your granting Mr. Clegg's request, we hereby undertake the following.

1. We will hold the above mentioned fund and the securities in which the same may from time to time be invested, at all times subject to the above mentioned lien and also subject to any additional lawful liens that may be imposed by law within the next ninety days with respect to said fund.

2. We assure you further that if the above transfer is made the fund in question will be invested and reinvested, including the loaning of the same on "call loans" (no investments to be made in securities or enterprises in which Mr. Clegg is personally interested) by us in such a way as will at all times protect the interests of the United States Government as well as the interest of Mr. Clegg in maintaining the fund at its maximum amount.

3. We agree that no part of the above named fund will be subject to check or draft by Mr. Clegg or anybody acting under authority from him, or will be withdrawn by him or any of his agents or by anyone at any time before the above mentioned lien or any lawful lien which may be imposed within the next ninety days is duly removed or before authority of such withdrawal is given by you or by the Commissioner of Internal Revenue, whichever event shall the earlier occur.

4. We further agree that if, after consideration of the claim for abatement of the above mentioned assessment which we understand will be duly filed by Mr. Clegg the Commissioner of Internal Revenue acting in pursuance of law should direct you as Collector of Internal Revenue to make demand for

57694°—27——72

the payment of the tax as assessed, we will pay to you out of the fund in question the amount of such assessment, it being understood, however, that Mr. Clegg does not waive his right to make payment under protest, or other lawful right.

If you decide to accede to the above mentioned request of Mr. Clegg, we will advise you of the receipt of said fund and will from time to time make any reports which may be requested by you as to the amount and status of such fund.

Respectfully,                              EMPIRE TRUST COMPANY,
                    (Signed)        LeRoy W. Baldwin, President. ·

September 7th, 1920.

Equitable Safe Deposit Company of New York,
43 Exchange Place,
New York City, N. Y.

Dear Sirs:

It having been represented to me that Mr. A. E. Clegg, who has deposited in Box No. 3061 of your institution the sum of Two million, four hundred fifty-six thousand, eight hundred fifty-nine and 80/100 dollars subject to lien imposed by law upon the failure of Mr. Clegg to pay additional income tax for the year 1919, assessed under date of August 27th, 1920, proposes to place such fund in the hands of the Empire Trust Company, 120 Broadway, New York City, for investment and reinvestment including loaning the same on "call loans," and the said Empire Trust Company having advised me that they will accept such fund subject to the lien now imposed and any other lien which may be imposed upon such fund within ninety days, this authorizes you to deliver said fund to the Empire Trust Company and if such delivery is made relieves you from any liability which may have been incurred by you upon receipt of notice of the above named lien.

Respectfully,        (Signed)        Wm. H. Edwards,
                        Collector of Internal Revenue,
                        Second District of New York.

Sept. 7, 1920.

Empire Trust Company,
120 Broadway,
New York, N. Y.

Dear Sirs:

I hand you herewith $2,456,859.80, which I request you to invest and reinvest, including the loaning of the same on call loans, (no investments, however, to be made in securities in enterprises in which I am personally interested), and to continue such investments and reinvestments, from time to time, holding the same and the securities acquired; subject, nevertheless, to a lien dated August 28th, 1920, for $1,501,288.20, based upon an assessment dated August 27th, 1920, made by the Commissioner of Internal Revenue for alleged unpaid income tax.

Within the next thirty days approximately, I expect to give you further instructions in respect to the foregoing funds, my desire, expectation and intention being to arrange to have this money invested in American Flag Ships under the provisions of the Jones Bill and the regulations which the Shipping Board shall establish.

I am expecting to have conferences with the Commissioner of Internal Revenue, and other proper United States authorities, to arrive at a conclusion in respect to the assessment and lien above referred to and will upon the conclusion of those conferences give you further instructions.

Will you please advise the Collector of Internal Revenue for the Second District of New York, that you hold the above funds subject to the aforesaid assessment and lien and send him, if you will, a copy of this letter for his information?

Yours very truly,                          (Signed)        A. E. Clegg.

September 7, 1920.

A. E. Clegg, Esq.,
104 Eighth Avenue,
Brooklyn, New York.

Dear Sir:

We acknowledge the receipt from the Equitable Safe Deposit Company for your account of Two million four hundred and fifty-six thousand eight hundred and fifty-nine dollars and eighty cents ($2,456,859.80) which we are to hold and invest and reinvest subject to the terms of your letter of even date, of which a copy is hereto attached, and to the terms of our letter of today to Mr. William H. Edwards, Collector of Internal Revenue, of which a copy is also attached. We shall render to you from time to time the interest and income therefrom less our commission.

Respectfully,                          EMPIRE TRUST COMPANY,
                          (Signed)        LeRoy W. Baldwin, President.

September 7th, 1920.

William H. Edwards, Esq.,
Collector of Internal Revenue,
2nd District of New York,
Custom House, New York City, N. Y.

Dear Sir:

We have today received from the Equitable Safe Deposit Company the sum of Two million four hundred fifty-six thousand eight hundred and fifty-nine dollars and eighty cents ($2,456,859.80) belonging to Mr. A. E. Clegg which we agree to hold and invest and reinvest as instructed in Mr. Clegg's letter of even date, of which we enclose a copy. We understand that this money is subject to a lien imposed on the basis of an assessment of additional income tax against Mr. Clegg for the year 1919, and we shall hold the same subject to the terms of our other letter to you, of today, in the same matter.

Respectfully,                          EMPIRE TRUST COMPANY,
                          (Signed)        LeRoy W. Baldwin, President.

In addition to the foregoing letters, on the same day each of the petitioners also addressed letters identical in form with each other to the Empire Trust Co. with reference to the letters of that company to the Collector of Internal Revenue setting forth the terms upon which the money would be received for deposit. The following is a copy of the letter of petitioner Clegg:

September 7, 1920.

Empire Trust Company,
120 Broadway,
New York, N. Y.

Dear Sirs:

Referring to your letter of even date to the Collector of Internal Revenue, Second District of New York, I consent without waiving any legal rights against

the Collector of Internal Revenue or the United States Government, to the delivery by you of the same and to the terms thereof, upon the distinct understanding and condition that you are to give five (5) days' notice, in writing, addressed to the office of my attorneys, Messrs. Noble, Morgan and Scammell, 115 Broadway, New York City, N. Y., of any proposed payment of any part of the moneys referred to therein to the Collector of Internal Revenue, in order that I may properly protest against the said payment and otherwise preserve all my legal rights.

          Very truly yours,                    (Signed)      ᐧ A. E. CLEGG.

The entire proceeds of the sale, amounting to $4,913,819.60, was originally deposited in one account under the title "Account of Collector of Internal Revenue, Second District of N. Y., a/c Kerr-Clegg." Subsequently the fund was divided and the amount belonging to petitioner Kerr was placed in a separate account entitled "Collector of Internal Revenue, Second District N. Y., and H. F. Kerr." Similar action was taken with reference to the amount belonging to Clegg, whose account was designated "Collector of Internal Revenue, Second District N. Y., and A. E. Clegg."

All of the money so deposited by the petitioners has remained on deposit at the Empire Trust Co. upon the terms and conditions contained in the letters set forth above, with the exception of $300,000 withdrawn during the year 1921 by each of the petitioners with the consent of the Bureau of Internal Revenue. All interest and income derived from said money on deposit and the securities in which invested has been paid to the petitioners.

On September 7, 1920, the Collector of Internal Revenue issued to and served upon each of the petitioners a second notice and demand for taxes assessed, with a penalty of 5 per cent on the amount of taxes named, to wit, $1,501,288.20. On September 15, 1920, the petitioners each filed with the Collector of Internal Revenue a claim for abatement of the taxes so assessed against each of them. On October 1, 1920, the Commissioner, in reply to a request for information as to the basis of said assessments, addressed identical letters to each of the petitioners, a copy of the letter sent to petitioner Clegg being as follows:

                                                        October 1, 1920.
Mr. Alfred E. Clegg,
44 Beaver Street,
New York, New York.
Sir:
    Complying with the request of Messrs. Noble, Morgan & Scammell, your attorneys, you are advised that the recent assessment against you for additional income tax for the year 1919 was based upon the following facts:
    Subsequent to March 1, 1913, you purchased shares of stock in the Kerr Navigation Corporation, organized and existing under the laws of the state of New York. During the year 1919 this corporation sold all of its assets to the American Ship and Commerce Navigation Corporation, also organized and existing under the laws of the state of New York, and received in payment

therefor slightly less than a majority of the outstanding shares of capital stock of that corporation. Subsequently to this sale the Kerr Navigation Corporation was dissolved, and in the course of that dissolution you received as liquidating dividends a pro rata number of shares of stock in the American Ship and Commerce Navigation Corporation, which shares of stock were of a fair market value, when received by you, in excess of the cost of your shares of stock in the Kerr Navigation Corporation.

This excess was, under the authority. of Section 201(c) of the Revenue Act of 1918, and the Rules and Regulations adopted by this Bureau pursuant thereto, income for the year 1919, and should have been included by you in your original return for that year.

Respectfully,                    (Signed)        Wm. M. Williams,
                                                 Commissioner.

In September, 1920, the Commissioner made an assessment against the Kerr Navigation Corporation of additional income and profits taxes totaling $6,517,795.48, and on September 8, 1920, the Collector of Internal Revenue, Second District of New York, issued to the Kerr Navigation Corporation notices and demands for the additional taxes so assessed. On September 15, 1920, the Kerr Navigation Corporation filed claims for abatement of these additional taxes. The Commissioner upon consideration of said claims for abatement allowed said claims in part and redetermined the additional taxes due to be $1,381,530.85. The Kerr Navigation Corporation then submitted to the Commissioner an offer of compromise in settlement of said taxes, and on July 7, 1923, the Solicitor of Internal Revenue advised the Kerr Navigation Corporation, through their attorneys, that the Commissioner had decided to accept $900,000 in compromise of said additional income and profits taxes. The case was thereafter closed by the payment of $900,000 by the Kerr Navigation Corporation.

After the deposit of the funds in the Empire Trust Co. the petitioners continued their efforts to obtain the release of their money from the claims of the Government and declared their intention to invest said money in the building of new ships in American shipyards so as to bring themselves within the provisions of section 23 of the Merchant Marine Act of 1920. On October 13, 1920, each of the petitioners addressed identical letters to the Commissioner, enclosing therewith identical letters addressed on the same date by each of them to the United States Shipping Board and the Collector of Internal Revenue. A copy of the letter and enclosures forwarded by petitioner Clegg is as follows:

October 13, 1920.

Honorable William M. Williams,
Commissioner of Internal Revenue,
Washington, D. C.

Dear Sir:

In the Matter of the Assessment of $1,501,288.20 against A. E. Clegg for Additional Income Tax for the year 1919,

On September 7, 1920 there was placed in the hands of the Empire Trust Company of New York the sum of $2,456,859.80, such sum representing the gross proceeds arising from the sale of an interest in ten ships, each documented under the laws of the United States, built prior to January 1, 1914, such sale having been made by selling on the 28th of August 1920 certain shares of stock of Kerr Navigation Corporation (in whose name the said ships were documented). The sum above mentioned was subject to the claim of the Government for an alleged lien on account of the above mentioned assessment for additional income tax for the year 1919. This transfer of funds was the subject of letters dated the 7th of September 1920, copies of all of which are on file with you.

Relative to the fund above mentioned I have written the United States Shipping Board a letter dated the 15th of September 1920 which letter is set out in full below viz.:

September 15, 1920.

United States Shipping Board,
Admiral W. S. Benson, Chairman,
Washington, D. C.

Gentlemen:

I, the undersigned, A. E. CLEGG, have sold my interest in 10 ships, each documented under the laws of the United States, built prior to January 1, 1914, by selling, on August 29, 1920, certain shares owned by me of the stock of Kerr Navigation Corporation (in whose name the said ships were documented), and I desire to invest the entire proceeds, available, arising from the said sale in the building of new ships in American ship yards, such ships to be documented under the laws of the United States and to be of the type approved by the United States Shipping Board.

On September 7th, 1920, I placed the gross proceeds ($2,456,859.80) arising from the sale of my interest in the said ships, in the hands of the Empire Trust Company of New York, accompanied by a letter in the course of which I said:

"Within the next thirty days approximately I expect to give further instructions in respect to the foregoing fund, my desire, expectation and intention being to arrange to have this money invested in American flag ships under the provisions of the Jones Bill and the regulations which the Shipping Board shall establish."

The proposed investment is intended to be made pursuant to the provisions of Section 23 of the Merchant Marine Act 1920 (otherwise known as the Jones Bill) which provides in the second paragraph thereof as follows:

"That during the period of ten years from the enactment of this Act any person a citizen of the United States who may sell a vessel documented under the laws of the United States and built prior to January 1, 1914, shall be exempt from all income taxes that would be payable upon any of the proceeds of such sale under Title I, Title II and Title III of the Revenue Act of 1918 if the entire proceeds thereof shall be invested in the building of new ships in American shipyards, such ships to be documented under the laws of the United States and to be of a type approved by the board."

I desire and intend to claim in respect to the proceeds of the sale above mentioned the exemption provided for by Section 23 above, and to do all things necessary to entitle myself to this exemption; and in order that I may to this extent aid in developing and encouraging the maintenance of American flag ships, may I not count upon the cooperation and aid of the Shipping Board within the meaning of the Jones Bill, to-wit, the upbuilding of American Mer-

chant Marine, that it will so formulate its rules and regulations as will permit the investment of the fund above mentioned in American flag ships.

I am having plans prepared for the type of ships in which to make this investment, which as soon as ready, I will submit for approval pursuant to the provisions of the above mentioned Section 23.

It is not likely that the new ships, in the building of which I propose to invest the proceeds of the sale above mentioned, can be completed before the 15th of March 1921, which is the date on which returns of income for the year 1920 are required to be filed under the Revenue Act of 1918. Accordingly it is not likely that the making of the investment can be completed directly, by the 15th of March 1921. It seems probable that the provisions of the first paragraph of Section 23 of the Merchant Marine Act 1920 providing for the setting aside of funds, under Rules and Regulations to be made by the Board, in a replacement or trust fund for investment, is intended to apply to a case such as this where it may be impossible to invest the proceeds of the sale above mentioned prior to the time for the filing of the next income tax return. Accordingly will you please let me know the rules and regulations which have been made by the United States Shipping Board relative to the setting aside of such funds for investment as above mentioned. If no such rules and regulations have yet been made, I beg to request you to either promulgate the necessary rules and regulations or advise me as to your requirements relative to the investment of the proceeds of the sale above mentioned, in a replacement or trust fund for the purpose of being invested in the building of new ships in American shipyards, such ships to be documented under the laws of the United States and to be of a type approved by the Board.

Will you please advise me what regulations have been worked out between the Treasury and the Shipping Board to facilitate this purpose?

All of the vessels owned by the Kerr Navigation Corporation are documented under the laws of the United States and were built prior to January 1, 1914. The Kerr Navigation Corporation is incorporated under the laws of the State of New York under the special provisions thereof relating to navigation corporations. Its sole business is that of operating ocean going steamships. This same situation existed at the time of the sale made by me as above stated of certain shares of stock of the Kerr Navigation Corporation.

At the beginning of 1916, my associate, Mr. H. F. Kerr, and I organized the Kerr Steamship Line (a partnership). We developed a large business and early placed at the disposal of the Shipping Board our shipping organization and agency facilities in Europe and elsewhere. We were able to make our business grow very rapidly and on June 1st, 1917, we organized the Kerr Steamship Company, Inc., which took over the business and assets of the Kerr Steamship Line.

At or about this time we got together a group of associates and with them and the Kerr Steamship Company, Inc., arranged for the purchase of eight Austrian ships, the title of which was on July 17th, 1917, taken by the Kerr Navigation Corporation, then organized. These ships carried war supplies to Europe throughout the war, some of them being requisitioned for a time by General Pershing in Europe and all being requisitioned in turn by the Shipping Board. During the war I served on the Shipping Board and Shipping Control Committee as manager of trans-Atlantic and trans-Pacific trade, and after the Armistice was the first Assistant-Director of Operations to be appointed in New York for the Atlantic Coast.

In 1919 my associates above mentioned and myself assisted in bringing about a reorganization of the Kerr Navigation Corporation for the purpose of secur-

ing additional capital to be invested in the purchase of additional American flag ships. In accordance with the plan of reorganization, the eight former Austrian ships above mentioned were turned over to the new corporation which also secured new capital to the extent of $7,600,000. This new corporation assumed the name of the Kerr Navigation Corporation (which was thereupon dissolved), carried on the business formerly done by that corporation, and, with part of the new capital provided in the reorganization, purchased from the United States Shipping Board three other ships so that it is now the owner of ten American flag ships (one of the original eight ships having been lost at sea).

My associates and I, with others, were also instrumental in acquiring other foreign ships for the American flag, which carried war supplies to Europe during the war. I make mention of these facts in order that the identification of myself, Mr. Kerr, and of my other associates and the Kerr Steamship Company, Inc., with the upbuilding of the American Merchant Marine may be recalled to your attention. My purpose to devote the proceeds from the sale of my interest in the ships of the Kerr Navigation Corporation on August 29th, 1920, is merely to further carry out the efforts which my associates and I have made in developing shipping for American flag ships.

Shortly after the 11th of November 1920 I shall be entitled to become and expect and intend to become a fully naturalized American citizen. My first citizenship papers were taken out immediately after the signing of the Armistice, November 11, 1918. All of my business interests are in the United States, and I am and have been actively engaged in the steamship business and expect to continue to be during the remainder of my life; furthermore, I reside and expect to reside in the United States for the rest of my life.

If arrangements can be made with the Shipping Board for the appropriate dedication of the funds mentioned in new American Ships, the building of the ships will not have been completed before I shall have become an American citizen and the purpose of the Act of Congress in the maintenance and upbuilding of the American Merchant Marine will be kept in view and this purpose and object attained as the primary end of the law, as well as my own object, upon the working out of an appropriate method of having these funds invested as above mentioned.

My associate, Mr. Kerr, is making a similar application in respect to the $2,456,959.80 received by him as the gross proceeds of the sale of his interest in the ten ships above mentioned. Will you be good enough to arrange for conferences needed to put this application through?

Respectfully yours,

A. E. Clegg.

I beg to reaffirm, in this letter to you, all of the statements made in my letter to the United States Shipping Board which is set out in full above.

Attached hereto is a copy of a letter of even date herewith, which I am writing to the Honorable William H. Edwards, Collector of Internal Revenue for the Second District of New York, relative to this matter.

I hereby claim, in respect to the $2,456,859.80 above mentioned, the exemption provided for by Section 23 of the Merchant Marine Act 1920. This section is set forth in the above copy of my letter to the Shipping Board. I desire to do all things necessary to entitle myself to the exemption now claimed, and if you have any special form on which you desire to have the claim filed I will appreciate it if you will furnish me such form. Will you also kindly let me know whether there are any other things which you would like to have done in connection with the filing of this claim for the exemption above mentioned.

I desire a hearing on this claim before any action is taken or conclusion reached by you.

Section 23 of the Merchant Marine Act 1920 apparently contemplates co-ordinated action by the United States Shipping Board, the Treasury Department and the Commissioner of Internal Revenue. Accordingly I request that you take all action necessary in connection with the Treasury Department and the Shipping Board in order to arrange for a full hearing on this claim. Will you not be good enough to advise me relative to such hearing.

My associate, Mr. H. F. Kerr, is making a similar claim and application in respect to the $2,456,959.80 received as the gross proceeds of his interest in the ten ships above mentioned.

Respectfully yours,

(Signed)      A. E. Clegg.

The letter to the Collector was as follows:

October 13, 1920.

Honorable William H. Edwards,
Collector of Internal Revenue,
Second District, New York,
Custom House, New York City.
Dear Sir:

In the Matter of the Assessment of $1,501,288.20 against A. E. Clegg for Additional Income Tax for the year 1919.

On September 7, 1920, there was placed in the hands of the Empire Trust Company of New York the sum of $2,456,859.80, such sum representing the gross proceeds arising from the sale of an interest in ten ships, each documented under the laws of the United States, built prior to January 1, 1914, such sale having been made by selling on the 28th of August 1920 certain shares of stock of Kerr Navigation Corporation (in whose name the said ships were documented). The sum above mentioned was subject to the claim of the Government for an alleged lien on account of the above mentioned assessment for additional income tax for the year 1919. This transfer of funds was the subject of letters dated the 7th of September 1920, copies of all of which are on file with you.

Relative to the fund above mentioned I have written the United States Shipping Board a letter dated the 15th of September 1920 which letter is set out in full below viz.:

*          *          *          *          *          *          *

. I beg to reaffirm, in this letter to you, all of the statements made in my letter to the United States Shipping Board which is set out in full above.

Attached hereto is a copy of a letter of even date herewith, which I am writing to the Honorable William M. Williams, Commissioner of Internal Revenue, Washington, D. C., relative to this matter.

I hereby claim in respect to the $2,456,859.80 above mentioned the exemption provided for in Section 23 of the Merchant Marine Act 1920. This section is set forth in the above copy of my letter to the Shipping Board. I desire to do all things necessary to entitle myself to the exemption now claimed.

I beg to request you to permit the investment of the above mentioned sum of $2,456,859.80, upon which a lien has been claimed by the Government, in the building of new American flag ships as proposed in my letter to the United States Shipping Board above set forth, and as provided for in Section 23 of the Merchant Marine Act 1920. I request that as soon as the form of the investment shall have been determined and as soon as the United States Shipping

Board shall have advised me as to the rules and regulations made, or to be made by them, for setting aside this money in a trust fund for investment for the purposes above mentioned, you will authorize the Empire Trust Company, which now holds the fund, to transfer the same so as to make possible the proposed investment in American flag ships.

As you will note from my letters to the United States Shipping Board and to the Commissioner of Internal Revenue, I desire to have a full hearing upon this claim for exemption.

My associate, Mr. H. F. Kerr, is making a similar claim and application in respect to the $2,456,959.80 received as the gross proceeds of the sale of his interest in the ten ships above mentioned.

Respectfully,

(Signed)      A. E. Clegg.

On September 15, 1921, an extension of time for filing having been granted, each petitioner filed with the Collector of Internal Revenue his income-tax return for the calendar year 1920. These returns were due, in the absence of an extension granted, on or before March 15, 1921. Petitioners kept their accounts upon the cash receipts and disbursements basis and made their tax returns upon that basis. Neither of the petitioners included in his income for 1920, as reported on said returns, any amount of the proceeds from the aforesaid sale of stock on August 28, 1920, but each attached to his return an exhibit setting forth the transaction of August 28, 1920, and alleged that no income had been received by either of them in 1920 from said transaction.

The claims for abatement of taxes assessed on August 27, 1920, and designated by the Commissioner as additional income taxes for 1919, filed by the petitioners September 15, 1920, were referred to the Committee on Appeals and Review of the Bureau of Internal Revenue, which recommended early in 1921 that the assessments be abated as to said year 1919. On February 9, 1923, the Commissioner advised the petitioners that their income-tax returns for 1917, 1918, 1919 and 1920 had been examined and set forth a statement of the results of such examination. The Commissioner therein advised the petitioners that their claims for abatement of the assessments of additional taxes for 1919 would be allowed but that there were due additional taxes for the year 1920 upon the alleged profit derived from the sale of stock on August 28, 1920, in the amount of $1,564,400.30 in the case of petitioner Kerr, and of $1,529,190.19 in the case of petitioner Clegg. The Commissioner likewise advised the petitioners of their right to appeal, in accordance with section 250 (d) of the Revenue Act of 1921, within thirty days and show cause why the additional tax should not be paid. The petitioners each duly filed an appeal to the Commissioner and sought a hearing thereon.

On February 12, 1924, before the petitioners had been heard on their last said appeals, the Commissioner made an assessment of additional income taxes for 1920 against each of the petitioners, in

the amount of $1,564,400.30 against Kerr, and in the amount of $1,529,190.19 against Clegg. On February 14, 1924, the Commissioner issued to each of the petitioners a certificate of overassessment as to 1919, allowing their claims for abatement of assessments of additional income taxes for said year. On March 26, 1924, the Collector of Internal Revenue issued notices and demands for taxes to each of the petitioners, giving notice of the assessment of additional income taxes for 1920 against each of them, the amount assessed against Kerr being $1,564,400.30, and the amount assessed against Clegg being $1,529,190.19. The Collector thereby demanded immediate payment, from Kerr of the amount so assessed less $269,-042.85, or a net amount of $1,295,357.45, and from Clegg of the amount so assessed less $278,583.52, or a net amount of $1,250,606.67. The petitioners protested to the Commissioner against the assessment of additional taxes before they had been granted a hearing on their appeals, as provided for in section 250(d) of the Revenue Act of 1921, and on April 4, 1924, the Commissioner sent a letter to the Collector, admitting that the assessments had been made inadvertently while appeals were pending, and authorizing and directing him to receive abatement claims. The letter was as follows:

April 4, 1924.

Collector of Internal Revenue,
    Second District New York,
        New York, N. Y.

Reference is made to an additional assessment of income taxes for the year 1920 in the amount of $1,529,190.19 assessed against Alfred E. Clegg, 44 Beaver Street, New York, N. Y., the assessment appearing at page 5, line 6, of the February 1924 Commissioner's assessment list for your district, and also to an additional assessment of income taxes for the year 1920 in the amount of $1,564,400.30 assessed against Henry F. Kerr, 44 Beaver Street, New York, N. Y., the assessment appearing at page 15, line 8, of the February, 1924 Commissioner's assessment list for your district.

It now appears that the provisions of section 250(d) of the Revenue Act of 1921 were not fully complied with in these cases. Although appeals were filed in both cases and hearings were requested, inadvertently opportunity was not afforded for the hearings. Mr. William O. Morgan, attorney for the taxpayers, called at this office this morning and protested against the action taken by the Bureau in assessing the additional taxes without first granting hearings. As the law clearly contemplates that hearings shall be granted in the case of any additional assessments unless the collection of the tax is in jeopardy, which does not appear to be the case in this instance, it is believed advisable to grant a hearing in each of these cases before proceeding further.

In view of the fact that section 250(d) of the Revenue Act of 1921 has not been complied with, you are authorized and directed to receive abatement claims which will be filed by these taxpayers against the additional assessments referred to above. You will forward the abatement claims immediately to this office, taking care in your letter of transmittal to make specific reference to the designation appearing in the upper left-hand corner of this letter. Mr. Morgan stated that there remains on deposit with the Empire Trust Company

approximately the sum of $4,300,000, which under an agreement entered into with the taxpayers is subject to the payment of any additional income taxes which may be found to be due. In view of the peculiar circumstances it is believed that you may properly withhold any action in respect to the collection of the assessments pending action by this office upon the abatement claims.

(Signed)      D. H. Blair,<br>Commissioner.

On April 5, 1924, each of the petitioners filed a claim for abatement of the assessment of additional taxes for 1920, made on February 12, 1924, upon the grounds: (1) that they did not receive any profit in 1920 upon the sale of stock on August 28, 1920, and (2) that prior to said assessments the petitioners had appealed from the proposed assessments and had not been granted a hearing on said appeal, as provided by section 250 (d), Revenue Act of 1921.

The Commissioner on December 16, 1924, mailed a letter, identical in each case except as to the addressee and the amount stated therein, to each of the petitioners advising them that their claims for abatement of additional income taxes for the year 1920 would be rejected. The Commissioner's letter to petitioner Clegg is as follows:

Your claim for the abatement of $1,529,190.19 additional income taxes assessed for the year 1920 has been examined and will be rejected for the reason that the Solicitor of Internal Revenue has held that a profit resulted from the sale in 1920 of your stock in the American Ship and Commerce Navigation Corporation which constituted income realized in that year.

The rejection will officially appear in the next schedule to be approved by the Commissioner.

From this determination of the Commissioner the petitioners appealed to this Board, the petitions in each case being filed February 11, 1925.

The stock in the Kerr Navigation Corporation owned by petitioners prior to the reorganization in 1919 was acquired by the petitioners subsequent to March 1, 1913. The 57,738 shares of Kerr Navigation Corporation stock owned by Kerr cost him $290,740. Pursuant to the reorganization in 1919 he received for his old stock 11,547 shares Class A and 12,630 shares Class B stock in the American Ship and Commerce Navigation Corporation. Upon the sale of his new stock on August 28, 1920, he received a total of $2,456,959.80, or a net gain of $2,166,219.80 over the cost of his old stock. The 57,737 shares of Kerr Navigation Corporation stock owned by Clegg cost him $290,735. Pursuant to the reorganization in 1919 he received for his old stock 11,547 shares Class A and 12,629 shares Class B stock in the American Ship and Commerce Navigation Corporation. Upon the sale of his new stock on August 28, 1920, he received a total of $2,456,859.80, or a net gain of $2,166,124.80 over the cost of his old stock. Neither of the petitioners herein has paid income or profits taxes on the gain so received.

OPINION.

VAN FOSSAN: The first and controlling question to be determined in this case is whether or not under the facts as set out above there was a receipt by petitioners in 1920 of the proceeds of the sale. We are of the opinion that there was such receipt. We are led to this conclusion by the clear weight of the evidence, especially that of petitioners' own witnesses concerning the transaction at the Chase National Bank; by the conduct of petitioners and their representatives during said transaction; by the statements of petitioners in letters addressed to various parties showing that they considered they had received the money; by the fact that the interest and income from the funds have been paid to and received by petitioners; by the fact that, regardless of what their instructions may have been, the only things officially done by the Government agents were to serve notice of assessments, subpoenas, and notices of a statutory lien against the funds, and, by agreement with petitioners, arrange for their safe-keeping; by the fact that the United States has never had possession of the money and has never claimed any right or interest in said funds except as arose from its lien under the statute; and finally by a consideration of the legal effect of the assertion by the United States of a statutory lien for taxes.

The record of the case from which we must sift the material facts is voluminous and conflicting. It is replete with charges by petitioners of illegal conduct and conspiracy on the part of the Government officials and with countercharges by the Government of intended tax evasion by petitioners. These matters are not, however, determinative of the issues here presented. This Board is not the forum for the trial of such questions, however aggrieved the parties may feel. If unlawful processes were employed in the proceedings here under discussion, if the statutory lien was illegally asserted, or if the United States has unlawfully interfered with petitioners' enjoyment of their property, petitioners might at any time have resorted to the courts for such redress as the law affords them. In any event, the Board has no jurisdiction to grant relief to persons so aggrieved. It has no jurisdiction to inquire into the motives of the Commissioner in making an assessment or into the conduct of his subordinates in levying or enforcing it. We could not relieve of a deficiency otherwise found to be valid even if it were established that the conduct of the Government agents in levying the assessment or their actions in enforcing it were not to be approved. If, in spite of all alleged irregularities, petitioners concluded the sale of their stock and received the proceeds therefrom, they received taxable income.

What, then, is the position of petitioners? They admit that they sold and delivered the stock; that the money was tendered to them in

payment; that they took it into their hands for counting; that they counted it and found it correct in amount; that they put it in a bag and started to carry it away; that they arranged for its safe-keeping; that the safe deposit box was taken in their names; that they wrote letters (voluntarily) referring to the money as having been received by them; that the money was deposited at their request in the trust company; that they have received all interest and income from the money so deposited; that the money belongs to them and that title is in them. Petitioners admit all of these facts and yet contend they have never "received" the money or come into possession of it. They predicate this position on the facts (as they allege) that while Noble and Scammell were counting the money a notice of assessment and a statutory lien were served on Kerr and Clegg and later a copy of the notice of lien was served on Noble; that as Thomas Clegg started to carry the bag away a Government man also grabbed hold of it; that a Government official stated they had instructions to "seize and impound" the money; that a lien notice was served on the safe deposit company and on the box containing the bag; that their letters of September 7, 1920, to the trust company were practically dictated by the Government officials; and that they have never been permitted the unrestricted enjoyment and use of the funds.

Even if all of the above alleged facts were admitted, our decision would not be altered. We believe that petitioners received the money, notwithstanding.

A most succinct and conclusive statement of the situation was made by the witness Scammell, one of petitioners' attorneys, when in reply to the question, "Did you make actual delivery of them [stock certificates]?" he said, "They had the certificates and we had the money." Here is the whole transaction in a nutshell. The sale had been made, the certificates had been delivered and the money received in payment. If any doubt remained as to the conclusiveness and completeness of their acts, it would be removed by his further statement, when he says, " * * * we had finished counting the money and the certificates were on the table and the transaction was completed and at the moment of completion this notice of assessment was served on Mr. Noble * * *." The conclusion consequent on this statement, "the transaction was completed," can not be avoided. McCawley, who served the notice (also called as a witness by petitioners) testified that in reply to his question, "Who is in possession of this money?" Noble replied, "I am." Two things only were important in the consummation of the sale,—the delivery of the stock to the Holding Company and the receipt by the petitioners of the correct amount of money in payment therefor. When these two events occurred, when their existence coincided in fact, the transaction was

completed and receipt of income was accomplished. No interference by third parties after this event could undo that which had already been done. The notices were not served until the money was in Noble's possession. The parties had passed the place where either might recall his agreement or retrace his steps. The transaction was completed.

In view of this fact, which is supported by the clear weight of the evidence, the conflict of testimony between Noble and Ellis as to the exact moment of the delivery of the stock and the precise manner of making payment to Kerr and Clegg, which conflict is resolved in the findings of fact, on the bases of the preponderance of the evidence, as well as the preponderance of the probabilities, in favor of Ellis, becomes immaterial.

It is not a little difficult to follow the reasoning employed by petitioners. Their argument is something to this effect: To have " receipt " one must get possession; " to possess is to have absolute power of dealing with the thing oneself and absolute power of excluding the action of everybody else." Therefore, since the Government agents filed a lien against the money and refused to let Kerr and Clegg walk away with it, since they required that the money be kept intact and properly supervised, it follows that " * * * Kerr and Clegg did not have the absolute power of dealing with the money and they did not have the absolute power of excluding the action of everybody else and therefore under all the definitions of ' possession ' they did not have possession of the money." Hence they contend there was no receipt. Obviously, under the conditions laid down by petitioners' counsel, a man is not in possession of an automobile though he drives it and uses it daily as his own, because under a chattel mortgage he may not sell it or remove it from the State. It is unnecessary to multiply examples of the effect of a contention which would vitiate the effect of all liens and most legal restrictions.

Every case must be judged in the light of its facts and by the character of the particular proceedings. The fact that in certain cases under criminal laws or under ejectment statutes certain interpretations have been given to certain words does not require that here, under a taxing statute, the same interpretation shall govern. The facts in the instant case will readily distinguish it from any of those cited by counsel for petitioners as authority for their position.

The only thing actually done by the Government agents on August 28 was to take such steps as they deemed necessary to perfect the statutory lien on the money paid to Kerr and Clegg and to assure themselves of the preservation of the fund intact. The situation presented many unusual phases. The evidence discloses that Kerr and Thomas Clegg had made reservations for sailing to Europe on

or about August 28, 1920, and actually did sail soon thereafter. The Government agents believed the case required effective action. The fact that in the judgment of petitioners these agents exceeded the bounds of their authority or acted with more vigor than petitioners felt was justified presents of itself no basis on which a deficiency may be disapproved, nor does the fact that the United States is not suable in tort confer on this Board any right to question a deficiency on that account.

We have indicated that we are not impressed by this argument of counsel that the petitioners did not receive the money because they have never been permitted the unrestricted possession, enjoyment and use of the funds. Receipt is one thing. Unrestricted possession, enjoyment and use is another and a very different thing. Receipt depends on the consummation of the transaction between the Holding Company and petitioners and not upon subsequent events. The sale was made, the stock was delivered, the money was paid, counted and found correct, the money was placed in the bag. Physical possession being in petitioners, all conditions being satisfied, the sale was completed and receipt was legally accomplished.

Nor is it material that possession may have been interfered with. Possession is a fact. It either exists or it does not. Once it exists the length of the unrestricted enjoyment is immaterial. If possession was had by petitioners, it matters not how many liens may have been asserted, or by whom.

Assuming for the moment that, as Noble asserted, at the time the Government served the notices of lien on him the money had not been placed in the bag; how does this alter the situation? He admits that after a conference they placed the money in the bag and that Thomas Clegg started to walk away with it. He also states that thereafter he delivered the certificates of stock to the Holding Company. By this course of action they waived any right they might have had to claim that the transaction had been interrupted before completion. They elected to go ahead with it and the transaction was completed. Even under such facts, which are those most favorable to petitioners, petitioners received the money.

Petitioners admit that payment was made by the Holding Company and that the stock was delivered to it. By inference they admit that they have now no right of action against the Holding Company for the price of the stock or its recovery. They even admit that the money in question " belongs to them." How, then, was ownership transferred? When the money passed from the hands of the Holding Company, to whom did it pass? Who received it? Obviously not the Chase National Bank, from whom it originally came; not the United States, for it was neither tendered

to, received by, touched nor claimed by the United States. The money was not abandoned; possession must have been in somebody. Tender and delivery were made to Kerr and Clegg. Noble then took the money in his hands. From the moment it left the possession of the Holding Company it has never been out of the hands of petitioners or their agents. Facts are the most complete answer to any theory. The conclusion from the facts in this case seems inescapable. Petitioners had legal possession and with legal possession went receipt.

Petitioners place great emphasis on the alleged "seizing and impounding" of the fund by the Government. But when the alleged seizing occurred, the property belonged to petitioners (this they admit), Noble had possession, "the transaction was completed"; the seizing and impounding, therefore, if such occurred, were from the possession of petitioners, of property which belonged to them, after the completion of the sale and payment. Assuming that there was a seizing and impounding, which in our opinion is not proved, such action would merely take the parties as it found them and would create no new rights between them. It had no retroactive effect. It would not void the sale or render it incomplete. The placing of a statutory lien against property is an every-day occurrence. To hold that such an action prevented the receipt of income would defeat the very purpose of the law in aid of which the statutory lien was created.

When we pass from the transaction of August 28, 1920, to the subsequent events we find ample corroboration of the conclusion announced above that petitioners received the money in fact and in law.

On August 31, 1920, while the details of the matter were still very fresh in mind, petitioners on their own motion and without the knowledge or suggestion of the Government wrote to Priest in the office of the Solicitor, stating that it was their " desire to devote *the proceeds received on the 28th instant* " to the acquisition of steamers under American registry. They repeated the admission in a later paragraph of the same letter, referring to the " *funds received by us.*" On September 15, 1920, again on their own motion, they wrote the Shipping Board, each petitioner referring to the funds received by his associate, as being " *received by him* "; and on October 13, 1920, they each wrote the Commissioner and the Collector of Internal Revenue (surely the last persons to whom an admission of receipt of income would be made if it were not a fact), reaffirming all statements made in the Shipping Board letters, and again each referred to the funds his associate had " *received as the gross proceeds of the sale of his interest in the ten ships above mentioned.*" The explana-

tion of counsel for petitioners that what petitioners meant was that "the money belonged to them" and that they were "entitled to receive" it is neither convincing nor is it supported by the evidence.

The above letters are not included in those which petitioners claim were written under duress. Their statements stand out as clear and distinct admissions of receipt. They can not lightly be explained away. Indeed, they need no explanation. They speak for themselves and prove beyond a doubt that petitioners considered that they had received the money. Even the charge of duress as to the letters of September 7, 1920, is entirely answered and disproven by petitioners' later statements in the Shipping Board letters, when, of his own election, each states "on September 7, 1920, *I placed the gross proceeds* ($2,456,859.80) arising from the sale of my interest * * * *in the Empire Trust Company* * * *.*"

There is a further fact which we deem important as corroborative of receipt. Petitioners have at all times received the income from the funds in the Empire Trust Co. Although there are situations where income may go to one party while ownership and possession are in another, income is not casually paid to one not entitled to receive it. If petitioners never received the money and never came into possession of it, certainly they were not entitled to the income from the funds on deposit. It is difficult to reconcile with reason the position of petitioners by which they admit the presence of all of the facts and elements usually demonstrative of receipt but deny the conclusion consequent from these facts.

In view of our conclusion that petitioners came into actual receipt of the money at the time of the sale on August 28, 1920, it becomes unnecessary to consider the question of constructive receipt.

Our discussion has perhaps already sufficiently indicated that in our opinion petitioners have relied on a misconception of the purpose and a misunderstanding of the effect of a statutory lien for taxes. Such a lien is not an assertion of title nor does it depend on possession. It is merely a form of security and an extraordinary remedy afforded the United States in aid of its tax laws. The statute says that under certain circumstances unpaid taxes "shall be a lien in favor of the United States" upon "all property and rights of property" of the taxpayer. The filing of such a lien is notice that the United States has an unpaid tax claim and its perfection gives the United States a certain preference in payment. The limitation on the control, enjoyment and use of the property that follows the filing of the lien is merely the intended consequence of the law. The compulsion resulting from this limitation and the possibility of the sale of the property to satisfy the lien are the legal

bases on which the effectiveness of the lien rests. Be it always remembered that the lien which was here asserted was a statutory proceeding authorized by Federal law. The lien has never been declared invalid or illegal by any court. If petitioners received the money the lien attached; if they did not the lien was futile gesture. Though the lien depended for effectiveness on receipt of the money by petitioners, receipt was in nowise controlled or affected by the lien.

There remains to consider only whether or not the deficiencies in that case are subject to a penalty of 5 per centum and interest at the rate of 1 per centum per month as provided by section 250 (e) of the Revenue Act of 1921.

Before a taxpayer becomes liable to the above penalty and interest charge, the terms of the Act imposing it must be strictly complied with. A legal demand must be made. The assessment of August 27, 1920, has been abated and is therefore disposed of. The assessment of February 12, 1924, was made while an appeal was pending with the Commissioner and before granting the hearing provided by section 250 (d) of the Act. Since no proper legal demand could be predicated on such an assessment, we are of the opinion that the deficiencies are not subject to the above penalty and interest.

The determination of the Commissioner as to the deficiencies is approved.

*Judgment will be entered after 15 days'
notice, under Rule 50.*

ARUNDELL and MILLIKEN not participating.

PHILLIPS, dissenting: Upon the hearing of this proceeding a conflict developed in the testimony of the witnesses as to what happened at the Chase National Bank on August 21. Having heard the witnesses, considered the weight to be given their testimony, the probabilities of the situation, and the extent to which their testimony checks into the time which was taken up by the transactions, I find myself unable to accept the version which has been incorporated into the findings of fact. In such circumstances I must, most reluctantly, record my dissent from the findings so far as they relate to what transpired at the Chase National Bank on that date. Without going into a detailed discussion of the evidence, it is sufficient to say that I am satisfied that the Government agents interrupted the transaction before payment for the stock had been accepted by the taxpayers, and that from that moment these agents prevented the taxpayers from coming into possession of the money, not by reason of any legal lien, but by reason of an illegal seizure under color of the authority of their office.

The prevailing opinion speaks of the Government agents as filing a lien against the money and taking steps to perfect this lien. If the agents did in fact merely subject this money to a statutory lien, I would have no doubt that the result reached is correct, whatever the facts may be with reference to the time when the lien was asserted and the money accepted. I am unable, however, to find any basis in fact or in law to sustain the theory that the transaction constituted the assertion of a statutory lien for taxes.

The Government agents claimed to act under section 3186 of the Revised Statutes by reason of a purported assessment of income taxes upon 1920 income made on August 27, 1920. This assessment was based upon a computation of profit on a transaction which had not yet taken place when the assessment was made. Under ordinary circumstances, taxes on 1920 income were not due and no assessment could be made until 1921. The only exception to this of which I know, or to which my attention has been called, was contained in section 250 (g) of the Revenue Act of 1918.[1] As no attempt was made by the Commissioner to comply with the provisions of that section, the purported assessment was an illegal and invalid act.

Even though the assessment could be considered a legal and valid act, the acts of the Government agents were nevertheless illegal. Section 3186 of the Revised Statutes,[2] under which they purported to act, provides for the imposition of a lien upon the property of a per-

---

[1] This section, so far as material, reads:

Sec. 250. (g) If the Commissioner finds that a taxpayer designs quickly to depart from the United States or to remove his property therefrom, or to conceal himself or his property therein, or to do any other act tending to prejudice or to render wholly or partly ineffectual proceedings to collect the tax for the taxable year then last past or the taxable year then current unless such proceedings be brought without delay, the Commissioner shall declare the taxable period for such taxpayer terminated at the end of the calendar month then last past and shall cause notice of such finding and declaration to be given the taxpayer, together with a demand for immediate payment of the tax for the taxable period so declared terminated and of the tax for the preceding taxable year or so much of said tax as is unpaid, whether or not the time otherwise allowed by law for filing return and paying the tax has expired; and such taxes shall thereupon become immediately due and payable. In any action or suit brought to enforce payment of taxes made due and payable by virtue of the provisions of this subdivision the finding of the Commissioner, made as herein provided, whether made after notice to the taxpayer or not, shall be for all purposes presumptive evidence of the taxpayer's design.

[2] This section read, in 1920, as follows:

If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount shall be a lien in favor of the United States from the time when the assessment list was received by the collector, except when otherwise provided, until paid, with the interest, penalties, and costs that may accrue in addition thereto upon all property and rights to property belonging to such person: Provided, however, That such lien shall not be valid as against any mortgagee, purchaser, or judgment creditor until notice of such lien shall be filed by the collector in the office of the clerk of the district court of the district within which the property subject to such lien is situated: Provided further, Whenever any State by appropriate legislation authorizes the filing of such notice in the office of the registrar or recorder of deeds of the counties of that State, or in the State of Louisiana in the parishes thereof, then such lien shall not be valid in that State as against any mortgagee, purchaser, or judgment creditor, until such notice shall be filed in the office of the registrar or recorder of deeds of the county or counties, or parish or parishes in the State of Louisiana, within which the property subject to the lien is situated.

son who after demand neglects or refuses to pay any tax for which he is liable. The section does not authorize or provide for the seizure or distraint of property and no seizure or distraint is necessary to create the lien which is provided for in the section. Sections 3187, 3188, 3190, 3193, *et seq.*, of the Revised Statutes provide a complete system for distraint, levy and sale of property for unpaid taxes. No attempt was made to proceed under those sections, and in fact no legal proceeding could have been taken under those sections until ten days after notice and demand for payment. Even under the stringent provisions for distraint, the collector could not have seized and retained more cash than was necessary to pay the taxes assessed, and fees, if any.

It is well settled that, in order to support and enforce a statutory lien for taxes, all the prerequisites of the laws granting the lien must be strictly complied with. *Thatcher* v. *Powell*, 6 Wheat. 119; *Parker* v. *Rule's Lessee*, 9 Cr. 64; *Ronkendorff* v. *Taylor*, 4 Pet. 349; *Stead's Executors* v. *Course*, 4 Cr. 403; *Early* v. *Doe*, 16 How. 610; *Williams* v. *Peyton's Lessee*, 4 Wheat. 77; *Mayhew* v. *Davis*, 4 McLean, 213; *United States* v. *Allen*, 14 Fed. 263.

The lien requires an assessment, a notice that the tax is due, and a specific demand upon the individual taxpayer. *United States* v. *Pacific Railroad*, 1 Fed. 97.

I must conclude that possession of the money was not taken under any authorized levy upon it under proceedings to distrain, that there was no provision of the law which authorized the agents to impound it, and that possession was taken by them without any authority or warrant of law but by virtue of superior force coupled with the provisions of the Federal laws making it a crime to resist Federal officers.[1]

This is further borne out by the undisputed testimony that the agents expressly stated that they would not take an amount of legal tender sufficient to pay the purported assessment and permit the taxpayers to retain the balance. The truth of the matter, as disclosed by the evidence in this appeal, is that the officers of the Government had determined that the proceeds of the sale should be tied

---

[1] Section 65 of the Criminal Code provides:

Sec. 65. Whoever shall forcibly assault, resist, oppose, prevent, impede, or interfere with any officer of the customs or of the internal revenue, or his deputy, or any person assisting him in the execution of his duties, or any person authorized to make searches and seizures, in the execution of his duty, or shall rescue, attempt to rescue, or cause to be rescued, any property which has been seized by any person so authorized; * * * shall be fined not more than two thousand dollars, or imprisoned not more than one year, or both; and whoever shall use any deadly or dangerous weapon in resisting any person authorized to make searches or seizures, in the execution of his duty, with intent to commit a bodily injury upon him or to deter or prevent him from discharging his duty, shall be imprisoned not more than ten years.

up until the taxpayers had settled not only the tax liability which purported to have been assessed against them, but also additional taxes which these officers believed were due from a corporation in which the taxpayers were interested as the principal stockholders; and in accomplishing that purpose these officials did not intend to be hampered by any restriction placed in the law for the protection of the property of taxpayers.

As I view the evidence, it establishes that the taxpayers were in the act of consummating a sale of their stock when the Government officials interfered and stated in no uncertain terms that their instructions were to seize and impound the proceeds, which they subsequently did, illegally. The taxpayers had two possible courses of action. They might refuse to proceed with the sale, in which case the default under the retender agreement would be theirs and the Harriman interests would be in a position to make the stock of the corporation worthless. They might proceed with the sale, permit the Government agents to take the money and later fight the matter out with the Government. The Government agents had insisted that the taxpayers might not take a single dollar of the proceeds, but did consent that it should be placed in a safe deposit vault in the names of the taxpayers but subject to Government control. The taxpayers chose what appeared to them to be the lesser of the two evils, consummated the sale, and permitted the proceeds to be taken into the control of the Government agents in accordance with the steps which those agents had outlined prior to the consummation of the sale. In such circumstances, remembering that the action of the agents was not the imposition of a lien but was an illegal impounding of the money, can it be said that, although the sale was consummated in 1920, the proceeds were realized in that year within the provisions of section 213 of the Revenue Act of 1918, which stated:

The amount of all such items shall be included in the gross income for the taxable year in which *received by the taxpayer* * * *.

There is no contention that a sale did not take place; the contention is that the receipt of the proceeds was deferred by reason of the circumstances and that any gain is to be accounted for in the year in which the proceeds become available to the taxpayers. The situation presented is unique. Upon the facts as I conceive them to be, it is my considered opinion that the proceeds of the sale were not received by the taxpayers within the taxable year, the taxpayers being upon a cash receipts and disbursements basis.

Counsel for the Commissioner contend that the Government can not be estopped from collecting taxes by reason of the acts of its officers. Possibly so, but neither can a taxpayer be required to report as income something which he did not receive on the ground that it was a Federal officer who prevented him from realizing the income. The question is not one of estoppel; it is rather whether the taxpayers, who keep their accounts and make their returns on a cash receipts and disbursements basis, received cash or its equivalent in 1920 from the sale. As I have pointed out above, this is not a case where the property was used to pay a liability or taken under proceedings to distrain, or under any other proper proceeding, in either of which cases it would seem that there could be no question that a taking or receipt by a legally authorized officer would be a receipt by the person against whom the proceeding was taken.

It is further urged that the money was received by the taxpayers when, after the Government agents had made known their intention, the taxpayers nevertheless proceeded with the sale and permitted the proceeds to be impounded. Everyone concerned had by that time recognized that the taxpayers were not to be allowed to take the money. They were surrounded by officials who had already advised them in very positive terms of their intention to seize and impound this money and who had refused to permit the taxpayers to have any part of it. By virtue of their office, if not by virtue of superior physical force, the officers dominated the situation. The taxpayers' efforts to secure the money had been made and had been unsuccessful; under protest they had made the only arrangement which seemed possible, which was to place it in a safe deposit box in their name but under control of the Government agents until some other arrangement could be made, and anything which was done after that was merely to carry out the arrangement already made.

All that the taxpayers received at the time of the sale was the right to recover the proceeds. Possession, control, and the power to use and enjoy the money was never theirs. Even the right to recover it was not against the United States, for the money was not received by it in payment of taxes, but was at most a personal action against those who had taken possession unlawfully. I can not believe that this is sufficient to constitute the receipt of cash within the purview of the statute and must express my dissent from the conclusion reached.

MURDOCK and TRUSSELL concur in this dissent.